IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02914-MEH

MARGARET E. PEREZ,

      Plaintiff,

v.

CAROLYN W. COLVIN, Commissioner of Social Security,

      Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

      Plaintiff, Margaret E. Perez, appeals from the Social Security Administration ("SSA")

Commissioner's final decision denying her application for disability and disability insurance

benefits ("DIB"), filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401-433, and her

application for supplemental security income benefits ("SSI"), filed pursuant to Title XVI of the

Social Security Act, 42 U.S.C. §§ 1381-1383c.  Jurisdiction is proper under 42 U.S.C. § 405(g).

Oral argument would not materially assist the Court in its determination of this appeal.  After

consideration of the parties' briefs and the administrative record, the Court REVERSES AND

REMANDS the Commissioner's final order.

## I. STATEMENT OF THE CASE

      Plaintiff seeks judicial review of the Commissioner's decision denying her applications for

DIB [Administrative Record ("AR") 129-136] and for SSI [AR 123-128] filed in November 2006.

After the application was initially denied on April 26, 2007 [AR 78-80], an Administrative Law

Judge ("ALJ") scheduled a hearing upon the Plaintiff's request for January 26, 2009 [AR 97-101].

Plaintiff and a vocational expert testified at the hearing.  [AR 42] The ALJ then secured additional

evidence from a mental health examination of the Plaintiff and from Plaintiff's physician regarding

her physical abilities.  The ALJ issued a written ruling on May 26, 2009 finding Plaintiff was not

disabled since October 6, 2005, because the Plaintiff did not have a severe impairment equaling

those listed in the applicable federal regulations; because she had the residual functional capacity

("RFC") to perform light work, she can lift and carry 20 pounds occasionally and 10 pounds

frequently, she can sit, stand and/or walk for 6 hours in an 8-hour day, and she can only occasionally

climb, balance, stoop, kneel, crouch and crawl; and because, considering Plaintiff's age, education,

work experience and RFC, there are jobs existing in significant numbers in the national economy

that Plaintiff can perform.  [AR 26-36]  The SSA Appeals Council subsequently denied Plaintiff's

administrative request for review of the ALJ's determination, making the SSA Commissioner's

denial final for the purpose of judicial review [AR 1-6].  *See* 20 C.F.R. § 416.1481.  Plaintiff timely

filed her complaint with this Court seeking review of the Commissioner's final decision.

## II. BACKGROUND

Plaintiff was born on May 9, 1955; she was 51 years old when she filed her applications for

disability and supplemental security income benefits on November 29, 2006.  [AR 123-136]

Plaintiff originally claimed her disability began on July 1, 2003 when she was 48 years old.  [*Id.*]

However, Plaintiff had previously applied for disability benefits in 2004, and the Appeals Council

denied her application on October 5, 2005.  [AR 43] Thus, for the present application, Plaintiff

2

changed the disability onset date to October 6, 2005 [*id.*] and reported that she was limited in her ability to work by "diabetes/lower back/liver, nuero."  [AR 157]  Plaintiff asserts she is "unable to use hands and stand on feet, and [she has] back problems."  [*Id.*] At the time of her application, Plaintiff's last day of work was July 1, 2003, because she was "unable to stand on feet and back." [*Id.*]  Plaintiff states that she takes no medication for her condition.  [AR 194]

Plaintiff's work history included self-employment (making and selling burritos) from 1997 to 1998 and from 2002 to 2003, and a school bus driver from 1999 to 2002.  [AR 139-141]  Her earnings in 2000 were $13,238.38, in 2001 were $581.57, in 2002 were $4,618.00 and in 2003 were $9,697.00.  [AR 143]

Plaintiff provides copies of medical records starting in July 2001; however, like the ALJ, the Court will review only those records for the relevant time period, October 6, 2005 - February 2009. A medical record from October 12, 2005 reflects that Plaintiff was seen for an office visit at Kaiser Permanente where Dr. Walters diagnosed Plaintiff with diabetes mellitus ("DM") type 2, uncontrolled; neuropathy, peripheral, diabetic; microalbuminuria; depressive disorder; and hypertriglyceridemia. [AR 466-467] Notably, Dr. Walters notes that Plaintiff's "legs and feet hurting for a year," but she "has not done any treatment" and is "awoken from sleep at night"; that Plaintiff "does not eat any breakfast"; and that her "DM [is] uncontrolled: told [her] to stop drinking reg cokes (6 per day), eat breakfast, take insulin before breakfast and dinner."  [AR 468] The doctor concluded with "[Plaintiff] will stop by in two weeks with sugars."

At Plaintiff's next visit to Kaiser on March 1, 2006, Plaintiff saw a nurse practitioner for a physical examination, who noted Plaintiff's "DM 2 w/ diabetic neuropathy" and "medication

noncompliance, history of." [AR 462] The NP also noted "importance of DM management & compliance/effects on major body systems discussed ad nauseum" and "stressed importance of taking blood sugars to bring to clinic." [AR 465]

On August 2, 2006, Plaintiff next saw Dr. Kuettner at Kaiser for a possible urinary tract infection. [AR 458] Dr. Kuettner listed Plaintiff's "diabetes mellitus ("DM") type 2, uncontrolled; neuropathy, peripheral, diabetic; and medication noncompliance, history of" and noted Plaintiff "checks her sugars about once a month; when she checked it last, she was in the 400s!; tells me she is under lots of stress with her mom." [AR 459] Dr. Kuettner concluded Plaintiff's "dm2 - totally out of control; does not check sugars; does not know what 70/30 insulin is" and ordered Plaintiff to "check sugars bid-tid and get back to me in 2 weeks." [*Id.*]

Plaintiff saw Dr. Howe at Kaiser on September 22, 2006 for pain in her feet. [AR 455-456] The doctor changed her pain medication and noted "neuropathy, likely diabetic type." [AR 457] Plaintiff went to Kaiser again on November 13, 2006 and saw a nurse practitioner for "leg and increasing back pain." [AR 452-453] The NP changed Plaintiff's medication and ordered a lumbar spine x-ray. [AR 454]

Plaintiff next consulted with a chiropractor, Darrin Marchus, D.C., apparently upon a referral from Kaiser, on November 28, 2006. [AR 235] Plaintiff reported to Dr. Marchus that, for two weeks, she awakened from sleep with leg pain, that Kaiser prescribed Percocet and Vicodin, that she had no prior episodes and that she had never had chiropractic treatment. [*Id.*] A record from the following day reflects that Plaintiff felt better after the treatment but felt pain again the previous night. [AR 234]

Plaintiff filed the present applications for DIB and supplemental security income benefits on November 29, 2006. [AR 123-136] Plaintiff claims that she stopped work due to her diabetes, lower back, liver and "neuro" (likely referring to diabetic neuropathy). [AR 157]

Plaintiff went back to Kaiser and saw Dr. Kuettner on December 5, 2006 complaining of leg and lower back pain. [AR 449-452]  Plaintiff reported that she had seen a chiropractor twice, "but does not feel better after treatment." [AR 450] Dr. Kuettner instructed Plaintiff to call physical therapy for a consultation and call to schedule a CT scan of her back. [AR 451]

On December 13, 2006, Plaintiff completed a personal pain questionnaire, an activities report and a fatigue questionnaire for Disability Determination Services. [AR 164-175] Plaintiff reported that she suffered "noropathy [sic] of the feet" and "constant pain in [her] feet and lower back," and could not walk, stand or sit "for a long period of time." [AR 164-166] For her activities, Plaintiff reported that she had "no problem" with personal care, needed no reminders for care, prepared one meal per week, completed one load of laundry per day, went grocery shopping, handled all of her finances, and went to church four times per week. [AR 167-172] Plaintiff also reported that she suffered pain and fatigue 24 hours per day every day. [AR 175]

On February 19, 2007, Plaintiff visited the Mental & Behavioral Health Department at Kaiser and saw Dr. Arvinte for "anxiety and depression." [AR 613-617] Plaintiff reported that she started feeling depressed 3-4 months previously; "cries a lot, has anxiety attacks, lost weight, is not hungry"; and "sleeps 1 hour at a time, walks around the house, feels restless and nervous at night." [AR 614]  She also reported that her blood sugars were in the 300s, she had poor compliance with medication, and she was traumatized when her brother tried to rape her at age 12. [AR 615] Dr.

5

Arvinte assessed Plaintiff with a GAF score of 65[1] [AR 616] and instructed the Plaintiff "therapy

---

[1]In *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012), the Tenth Circuit describes the GAF as follows:
The GAF is a 100–point scale divided into ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological, social, and occupational functioning. See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32, 34 (Text Revision 4th ed. 2000). GAF scores are situated along the following "hypothetical continuum of mental health [and] illness":
• 91–100: "Superior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities. No symptoms."
• 81–90: "Absent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members)."
• 71–80: "If symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)."
• 61–70: "Some mild symptoms (e.g., depressed mood and mild insomnia), OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."
• 51–60: "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."
• 41–50: "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."
• 31–40: "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child beats up younger children, is defiant at home, and is failing at school)."
• 21–30: "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)."
• 11–20: "Some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)."
• 1–10: "Persistent danger of severely hurting self or others (e.g., recurrent violence) OR

would be helpful for you" and to call back in 3 weeks. [AR 617]

Plaintiff was next referred to Martin Wong, Ph.D. for a consultative psychiatric evaluation on March 20, 2007.   [AR 618] Dr. Wong noted that Plaintiff "did not get around to mentioning depression until much later in the interview." [*Id.*] Plaintiff reported to Dr. Wong that she is "depressed again partly because of her sicknesses, partly because of her difficulties with her mother and partly because of generalized feelings about aging." [AR 619] She also told him that she spent most of her days attempting to do household chores and he noted Plaintiff is "more than adequate in self-care." [*Id.*] She also told him that she had no appetite, heard voices, and hallucinated by seeing both unknown people next to her and bugs on her body. [AR 620] Based on these reports and after a "mini mental examination," Dr. Wong diagnosed Plaintiff with "depression, recurrent, moderate with psychotic features" and "generalized anxiety disorder," and assessed a GAF of 55. [AR 620-621]

On April 25, 2007, a reviewing provider, M. Dilger, completed a Psychiatric Review Technique form for the Plaintiff, found that Plaintiff's depression only mildly limited her in activities of daily living, maintaining social functioning, and concentration, persistence and pace, noted that Plaintiff's auditory, visual and tactile hallucinations were likely caused by the medication she was taking, and concluded that Plaintiff's depression appears to be due to situational issues and pain.  [AR 220-233]

The next day, April 26, 2007, the SSA sent to Plaintiff Notices of Disapproved Claim

---

persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death."
• 0: "Inadequate information."

informing her that her claims for DIB and SSI were denied. [AR 78-83]  On June 22, 2007, Plaintiff completed an Appointment of Representative form, which identifies Clark Litten as her attorney [AR 77], and a Request for Hearing by Administrative Law Judge form [AR 84].

Plaintiff saw Dr. Walters at Kaiser again on August 6, 2007 for abdominal pain. [AR 641-644] Dr. Walters noted that Plaintiff "does not take sugars" and "Dm uncontrolled ... [s]he has neuropathy already. We need to take our sugars. We can control this if you are willing." [AR 642]

On August 13, 2007, the Office of Disability Adjudication and Review (ODAR) sent Plaintiff's counsel, Mr. Litten a letter confirming receipt of the request for hearing, informing Plaintiff of hearing procedures and explaining that a Notice of Hearing will be sent at least 20 days before the hearing notifying him of the time and place.  [AR 85-87]

Plaintiff next saw a nurse practitioner at Kaiswer on January 29, 2008 for hip pain. [AR 637-639]  The NP noted Plaintiff had "sciatica R>L since this weekend - thinks it's from her bed - doesn't work or exercise." [AR 638] He also noted Plaintiff was "morbidly obese ... she should do the back routine bid - she need[s] some stretching and aerobic fitness program." [AR 639] Plaintiff returned to Kaiser on February 13, 2008 for a pain medication injection. [AR 635-636]

Plaintiff was then admitted to Good Samaritan Medical Clinic on February 18, 2008 complaining of worsening back and leg pain. [AR 651-665]  She reported that "she has previously had back and leg pain but has gone away spontaneously." [AR 652] An MRI of Plaintiff's lumbar spine showed "moderate degenerative disk disease at L-5 - S-1 with bilateral facet osteoarthritis" and she was admitted for pain management.  *Id.*  On February 20, 2008, Plaintiff underwent a "tranforaminal epidural steroid injection" for the sciatica. [AR 629-634]  Notably, a chart in this

8

record reveals that Plaintiff's weight remained virtually the same between March 26, 2007 through February 18, 2008 (between 224 and 228 pounds). [AR 632] Upon discharge, a physician noted that Plaintiff was "post steroid injection ... without sig[nificant] relief. We have adjusted pain meds and also insulin (very poorly controlled dm)."  [AR 655]  He also noted, "pain continues to be severe. Query malingering, drug seeking as she will be comfortable appearing when she is not aware of being viewed but when seen she will start to groan." [*Id.*] Plaintiff was discharged home on February 28, 2008. [*Id.*]

Plaintiff returned to Kaiser and saw Dr. Pierce for pelvic pain on May 16, 2008. [AR 623-626] Dr. Pierce noted "lower abd tenderness, difficult to localize due to morbid obesity." [AR 626] A record from May 20, 2008 reveals that nurse called Plaintiff, who stated that her "[symptoms] have totally resolved since taking the medication Dr. Pierce prescribed." [AR 794]

On June 26, 2008, Plaintiff reported for the first time to the Salud Family Health Center ("Salud") for a "medication examination for disability." [AR 858-860] A physician's assistant noted that Plaintiff's blood sugar was 409, that her "current [diabetes] regimen is not working well for her," and that Plaintiff reported "she has no money for her medications." [AR 859] The PA noted Plaintiff's problems as "disability exam and paperwork; diabetes mellitus; depression, neuropathy; back pain; and obesity." [AR 859-860]

Plaintiff returned to Salud on July 10, 2008 for another "disability exam." [AR 855-857] She reported to Dr. Calabrese that "her back is her main disability," that she "had a cortisone injection in her lower back two months ago" with no relief, she "has never had any training in diabetes management." [AR 856] Dr. Calabrese listed Plaintiff's problems as "chronic low back pain;

diabetes mellitus, uncontrolled; carpal tunnel syndrome; and depression" and noted that the disability paperwork had been completed. [AR 857]

Plaintiff returned to Salud a week later, July 17, 2008 for a "re-check." [AR 854-855] Dr. Calabrese noted that Plaintiff had "not yet started the insulin or gotten a glucometer ... "is not yet scheduled with the PHA ... has not yet signed for records release from Kaiser ... did not bring medication list today." [AR 854] A record from July 24, 2008 notes that Plaintiff's insulin was "received" and that Plaintiff picked it up on August 8, 2008. [AR 853]

On July 25, 2008, the ODAR sent Mr. Litten a notice that the "file is now ready for review" and included forms for the Plaintiff to complete, including recent medical treatment, medications and work history. [AR 88-92]

On August 28, 2008, Plaintiff went to the Salud Clinic saying she was "sick," she had started the insulin only six days previously at an incorrect dosage, and her blood sugar was 527. [AR 848-851] Dr. Calabrese noted that Plaintiff "has demonstrated noncompliance," warned Plaintiff "this could potentially be a life and death situation," and recommended that Plaintiff "immediately go to the emergency room at Platte Valley." [AR 848] The doctor later noted that "[n]ot quite two hours after the patient left, [Dr. Calabrese] contacted Platte Valley and she had not yet presented to the emergency room." [*Id.*] However, at approximately 7:00 p.m.,Plaintiff presented at the ER of the Platte Valley Medical Center for dizziness, fatigue and left leg pain. [AR 806-827] Her blood sugar at admission was 527. [AR 807]  After cardiopulmonary tests and insulin treatment, her blood sugar reduced to 226 and she denied any pain, so she was discharged home approximately 5 hours later. [AR 808]

10

Plaintiff went back to Salud on September 2, 2008 for a follow-up appointment. [AR 846-847] She reported that she had gone to the ER, that she did not fill the prescription they gave her, and that she had been checking her blood sugars but did not write them down because she was "scared." [AR 846] Plaintiff returned to meet with a patient advocate on September 4, 2008, who noted that Plaintiff "is ready to make changes" including reading labels and eating less each day, but also "stated that I am going to die anyway." [AR 845] Plaintiff also met with Dr. Calabrese who noted the instructions she gave Plaintiff for diabetes management. [AR 843]

Plaintiff did not show up for her next scheduled appointment on September 25, 2008. [AR 841] However, she appeared for an appointment with Dr. Calabrese on October 2, 2008 "very excited" that her "sugars are better." [AR 839] She also requested a refill prescription for Percocet, which she stated she had gotten from Kaiser and was taking 6 pills each day. [*Id.*] The doctor noted a concern for "chronic pain with opiate use" and stated she "did not feel comfortable writing Percocet for her" and "[Plaintiff] will need to complete a narcotic contract at the next visit." [*Id.*] The doctor also explained the importance of exercise for Plaintiff's health issues. [*Id.*]

On October 7, 2008, Plaintiff completed another Appointment of Representative form identifying Teresa Abbott as her new attorney. [AR 93-95]

Plaintiff returned to Salud on October 14, 2008 with blood sugar at 469 and requesting medication for depression. [AR 838] She told Dr. Calabrese that she was unable to fill the prescription for pain medication due to finances and was out of, or almost out of, her other medication. [AR 837] The doctor noted Plaintiff was "in tears," and her neuropathy was "painful." [*Id.*]  The record also notes that Plaintiff called on November 7, 2008 seeking another prescription

11

for the pain medication. [*Id.*]

A record from November 25, 2008 reflects that Plaintiff called requesting a change in her pain medication to Vicodin. [AR 836] Dr. Calabrese noted that Plaintiff must be seen in person before any change in medication. [*Id.*] Accordingly, the office set an appointment for Plaintiff on December 2, 2008. [*Id.*] However, Plaintiff called again on December 1, 2008 requesting a refill for Neurontin saying that the bottle was "hard to open and when bottle was opened pills fell in toilet." [AR 909]

Plaintiff presented on December 2, 2008 asking that her pain medication be changed back to Percocet or to Vicodin because she was feeling "sick." [AR 832-834] Concerning Plaintiff's diabetes, Dr. Calabrese noted that Plaintiff was "noncompliant with medication usage" and wrote down specific instructions. [AR 832] The doctor also noted that she would prescribe a limited amount of Percocet for Plaintiff, "because I believe it is so important that she follow up in 10 days." [*Id.*] A hand-written note on this record reflects that Plaintiff call on December 15, 2008 asking for a refill of Percocet. [*Id.*]

Plaintiff returned on December 16, 2008 for her medication refill. [AR 830-831] Dr. Calabrese noted, "I am quite concerned with her noncompliance with her insulin ... I have again emphasized that this is dangerous for her." [AR 830] The doctor also noted that Plaintiff still complained of depression on the maximum dose of Paxil, so she added an additional medication and instructed Plaintiff to follow up in two weeks. [*Id.*] Two days later, Plaintiff called saying that her purse, containing all of her medications, was stolen from her car. [AR 829] Dr. Calabrese noted that she would refill all prescriptions, except Percocet. [*Id.*] A record from December 30, 2008 reflects

12

that Plaintiff did not show for the follow-up appointment with Dr. Calabrese. [AR 903]

On December 23, 2008, ALJ Jon Lawritson sent Plaintiff a Notice of Hearing informing the Plaintiff that the hearing would occur on January 26, 2009 in Denver, Colorado. [AR 97-118] Deborah Kay Christianson of Christianson Vocational Services was requested to appear as a vocational expert at the hearing. [AR 119] Plaintiff returned an Acknowledgment of Receipt (Notice of Hearing) form on December 27, 2008. [AR 120]

A record from January 8, 2009 reflects that Salud had received the Plaintiff's insulin that day and that Plaintiff would pick it up on January 12, 2009. [AR 902] A subsequent record on January 16, 2009 reflects that Plaintiff called Salud reporting that her blood sugar was 328; the doctors in attendance recommended that she go to the ER, but Plaintiff wanted to wait to be seen by Dr. Calabrese on January 20. [AR 901] The record also reflects that Plaintiff still had not picked up her insulin. [*Id.*]

On January 20, 2009, Plaintiff presented at Salud for an appointment with Dr. Calabrese. [AR 899-900] She reported that she had gone to Platte Valley as instructed on January 16, 2009; however, the doctor noted "no records available from Platte Valley." [AR 899] Dr. Calabrese also noted that Plaintiff's blood sugars had improved some, but "she remains highly insulin resistant." [*Id.*] The doctor also noted that Plaintiff's depression was "under reasonable control right now." [*Id.*]

On January 26, 2009, Plaintiff and her counsel, Teresa Abbott, appeared for the hearing, and the ALJ took testimony from the Plaintiff and from Ms. Christianson as a vocational expert. [*See* AR 41] The hearing opened with the ALJ seeking clarification of the status of the case, but Ms. Abbott was not aware of a previous unfavorable SSA decision in October 2005, so she stipulated

13

to an amended disability onset date of October 6, 2005. [AR 44-45]

Plaintiff testified that she completed the ninth grade in school; she had a burrito-making business in 2003; she was employed for one day driving a limousine bus, but "wrecked" it; she complied with medical instructions for her diabetes, but "sometimes [she] couldn't afford [her] insulin"; she had had back pain for 4-5 years and does not know why a medical record reflected that her previous back pain "went away spontaneously"; her back pain would feel better when she took her pills; the medication for her neuropathy (Gabapentin) makes her sleepy and suffer headaches and upset stomach; neuropathy feels like burning and numbing in her legs and feet; she gets foot and leg cramps that awaken her at night; she can walk three houses from her own house in 15 minutes; daily, she has neuropathy in her hands; she can take a shower, but has back pain; she no longer goes grocery shopping, does laundry or drives; she tries to wash dishes and makes her bed, but does not sweep, mop or do yard work; she does not lift anything; she does not go to movies, but goes to church and alternates between sitting, standing and laying down on the bench; she lays down six times per day, watches television, and reads her Bible; she feels sad and is on medication for depression; and she is better able to understand and follow instructions by Dr. Calabrese at Salud. [AR 47-64]

Ms. Christianson testified that a hypothetical employee – same age, education and work experience as the Plaintiff, who could occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, sit, stand and walk about six hours during an eight-hour workday, and occasionally climb, balance, stoop, kneel, crouch and crawl – could perform Plaintiff's past work as a burrito maker, as well as the positions of cashier, small products assembler, and a ticket seller. [AR 66-69]

14

When asked if the expert was aware of the December 2008 economic news release showing a decrease in the number of national jobs, Ms. Christianson testified, "Certainly, those numbers are always in flux ... and I think these numbers are a good approximation of jobs that exist." [AR 68-69]

At the conclusion of the testimony, the ALJ mentioned that he might arrange for the Plaintiff to see a mental health professional for evaluation of her depression. [AR 70]

On January 30, 2009, the ALJ addressed a letter to Dr. Calabrese requesting that she complete an "Ability to do Work-Related Activities (Physical)" form for the Plaintiff. [AR 876-885] In addition, Brett Vallette, PhD was asked to evaluate Plaintiff and complete an "Ability to do Work-Related Activities (Mental)" form. [AR 865-869]

Plaintiff went to the Salud Clinic on February 3, 2009 for a follow-up on her blood sugars [AR 897-898] Dr. Calabrese noted that Plaintiff was doing much better following instructions with her insulin and recording her blood sugars, but reminded Plaintiff that her diabetes could be well controlled with medication, diet and exercise. [AR 897]

On February 17, 2009, Dr. Vallette saw Plaintiff for the requested psychological evaluation, which included a clinical interview and mental status examination. [AR 870-875] Dr. Vallette noted that Plaintiff "is significantly obese," "looks tired and somewhat worn out," and stated to him she has "deteriorating disks," back pain, and "[her] legs are no good." [AR 870] She denied any physical or sexual abuse growing up. [*Id.*] Plaintiff reported that, during the day, she did some chores around the house, but could not do laundry, vacuuming or the grocery store; she watched television and read her Bible; she was able to dress and bathe herself and went to church; she has friends with whom she talked and went to church; and she had a driver's license, but said she "rarely drove" because

of pain. [AR 871] She reported that she slept up to 20 hours per day, but it was all interrupted, and she said she felt hopeless, worthless and worried.  She denied any anxiety, panic, PTSD or psychotic process. [AR 872] Dr. Vallette found Plaintiff to be truthful and fully cooperative. [*Id.*]

Dr. Vallette performed Wechsler Adult Intelligence Scale and Wechsler Memory Scale tests on the Plaintiff, and determined that "[a]lthough the client has an extremely low IQ, she is not mentally retarded"; rather, the doctor found Plaintiff had a learning disability, finished only the ninth grade and was in special education. [AR 873]  Plaintiff's memory function, on the other hand, was comparatively strong. [AR 874] Dr. Vallette diagnosed Plaintiff with dysthymia (mild, chronic depression) with periods of major depression; learning disability; back pain; neuropathy; obesity; diabetes; and a GAF score of 60-65. [*Id.*]

Plaintiff returned to Salud on February 24, 2009 for a follow-up on her blood sugars. [AR 895-896] Dr. Calabrese noted that the "majority of our time today was spent reviewing the requested information from social security disability." [AR 895] The doctor concluded that Plaintiff's diabetes "continues to be uncontrolled but is improved overall." [*Id.*] A record from March 20, 2009 reflects that Plaintiff called for a refill of Percocet; the doctor wrote a prescription "to last until appt 3-31-09." [AR 894]

Also on March 20, 2009, the ALJ provided Plaintiff's counsel with copies of Dr. Vallette's report and the request for information from Dr. Calabrese informing counsel that she was permitted to provide written comments concerning the new information, facts and law applicable to the case in light of the information, written questions to be submitted to the doctors, and a supplemental evidentiary hearing in light of the information. [AR 198-199] Counsel responded on March 23, 2009

16

stating that "we have no additional comments and we look forward to a decision in the case." [AR 201] Subsequently, on April 16, 2009, the ALJ provided Plaintiff's counsel with a copy of the requested report completed by Dr. Calabrese. [AR 202-204; 886-892] Counsel responded on April 22, 2009 stating that "we have no additional comments and we look forward to a decision in the case." [AR 205]  The ALJ issued an unfavorable decision on May 26, 2009.

### III. LAW

Here, the Court will review the ALJ's application of the five-step sequential evaluation process used to determine whether an adult claimant is disabled under Title II and Title XVI of the Social Security Act, which are generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

Step One determines whether the claimant is presently engaged in substantial gainful activity.  If she is, disability benefits are denied.  *See* 20 C.F.R. § 416.920.  Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. § 416.920(c).  If the claimant is unable to show that her impairment(s) would have more than a minimal effect on her ability to do basic work activities, she is not eligible for disability benefits. Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment.  *See* 20 C.F.R. § 416.920(d).  If the impairment is not listed, she is not presumed to

be conclusively disabled.  Step Four then requires the claimant to show that her impairment(s) and assessed residual functional capacity ("RFC") prevent her from performing work that she has performed in the past.  If the claimant is able to perform her previous work, the claimant is not disabled.  *See* 20 C.F.R. § 416.920(e) & (f).  Finally, if the claimant establishes a *prima facie* case of disability based on the four steps as discussed, the analysis proceeds to Step Five where the SSA Commissioner has the burden to demonstrate that the claimant has the RFC to perform other work in the national economy in view of her age, education and work experience.  *See* 20 C.F.R. § 416.920(g).

## IV. ALJ's RULING

The ALJ ruled that Plaintiff had not engaged in substantial gainful activity since the onset date of her disability, October 6, 2005 (Step One).  [AR 26]  Further, the ALJ determined that Plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine; diabetes mellitus with neuropathy; obesity; and carpal tunnel syndrome (Step Two).  [AR 27]  But, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment deemed to be so severe as to preclude substantial gainful employment (Step Three).  [AR 28-30]

The ALJ then determined that Plaintiff had the RFC to perform "light work ... except she can lift and carry up to 20 pounds occasionally and 10 pounds frequently; stand and walk about 6 hours during an 8-hour day; and sit about 6 hours during an 8-hour day. The claimant can only occasionally climb, balance, stoop, kneel, crouch, and crawl."  [AR 30]  The ALJ determined that the record reflects Plaintiff has performed daily activities such as preparing meals, household

18

cleaning, washing dishes, doing laundry, fixing her bed and attending church twice weekly, and concluded "[s]uch activities of daily living, when considered with the rest of the evidence, including the claimant's inconsistent statements found in the record regarding her back and leg pain, and the claimant's general lack of non-compliance with medical treatment in light of physician's [sic] recommendations to combat her diabetes, are inconsistent with her alleged disabling symptoms and suggest that she retains significant capacity despite her subjective complaints." [AR 31]

After ruling that Plaintiff was unable to perform any past relevant work (Step Four), the ALJ went on to determine that considering Plaintiff's age, education, work experience and residual functional capacity, Plaintiff could perform work existing in significant numbers in the national economy (Step Five). [AR 35] As a result, the ALJ concluded that Plaintiff was not disabled at Step Five of the sequential process and, therefore, was not under a disability as defined by the SSA. [AR 36]

Plaintiff sought review of the ALJ's decision by the Appeals Council on June 11, 2009. [AR 19] On October 2, 2009, the Appeals Council notified Plaintiff that it had determined it had "no reason" under the rules to review the decision and, thus, the ALJ's decision "is the final decision of the Commissioner of Social Security." [AR 16-18] However, in or about October/November 2010, Plaintiff's counsel requested that the Council re-open the claim to consider new evidence; the Council granted the request on November 3, 2010 and instructed the attorney, Ms. Abbott, to submit evidence that is "new *and* material to the issues considered in the hearing decision dated May 26, 2009." [AR 12-15] On November 22, 2010, another attorney, Steven Earl, submitted a brief arguing that the ALJ "failed to consider the various [§ 404.1527(d)] factors ... in evaluating the opinion of

the treating physician," and "failed to ... consider[ ] the impact of the claimant's obesity on her ability to work." [AR 208-211] The Appeals Council, on January 27, 2012, once again "found no reason" to review the ALJ's decision. [AR 5-11]

On June 26, 2012, Plaintiff filed a third Appointment of Representative form identifying Joseph Whitcomb as her attorney. [AR 4] The following day, Mr. Whitcomb requested from the Appeals Council an extension of time within which to file a civil complaint since "[the final notice was mailed to the wrong address and the claimant never received it."[2] [AR 3] More than a year later, on September 28, 2013, the Appeals Council granted the request and ordered Plaintiff to file a civil action within 30 days after receiving its letter.  [AR 1-2]  Plaintiff filed her Complaint in this matter on October 25, 2013.

## V. STANDARD OF REVIEW

This Court's review is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied.  *See Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *see also White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001).  Thus, the function of the Court's review is "to determine whether the findings of fact ... are based upon substantial evidence and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970).  "Substantial evidence is more than a scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept

_____

[2]The Court notes that the January 27, 2012 notice was sent to the same address as that listed on the June 26, 2012 Appointment of Representative form.

20

to support the conclusion." *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  The Court may not re-weigh the evidence nor substitute its judgment for that of the ALJ.  *See Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991) (citing *Jozefowicz v. Heckler*, 811 F.2d 1352, 1357 (10th Cir. 1987)).  However, reversal may be appropriate when the ALJ either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards.  *See Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

## VI. ISSUES ON APPEAL

On appeal, Plaintiff raises three issues: (1) whether the ALJ erred when he found that the Plaintiff's depression did not constitute a severe impairment; (2) whether the ALJ erred by failing to consider and make findings of fact regarding whether Plaintiff had a listed impairment pursuant to 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.05; and (3) whether the ALJ erred by failing to assign restrictions in the RFC relating to Plaintiff's carpal tunnel syndrome, obesity and mental impairments.

## VII. ANALYSIS

The Court will address each of Plaintiff's issues in turn.

**A.**     **Whether Depression is "Severe Impairment"**

The ALJ in this case considered Plaintiff's alleged depression not to be a "severe medical impairment that has more than minimally impacted the claimant's ability to work." [AR 27]  In so concluding, the ALJ first noted minimal treatment reflected in the record   He then compared an evaluation performed by a treating source from Kaiser in February 2007 with a consultative exam

performed in March 2007 in response to Plaintiff's application for benefits. [*Id.*; *see also* AR 613-617 and AR 618-621]   The ALJ noted that the treating physician diagnosed Plaintiff with a depressive disorder and assigned a GAF score of 65, while the consultative examiner diagnosed Plaintiff with moderate depression and generalized anxiety disorder and assigned a GAF score of 55.   The ALJ accorded the consultative examiner's opinion little weight as it was inconsistent with the treating physician's examination performed just a month earlier and with the record as a whole. [AR 27]

Furthermore, he found that a review of the entire record revealed the Plaintiff's depressive symptoms seemed to wax and wane over time; in fact, a record in January 2009 revealed that her symptoms had improved.   [AR 28]   The ALJ then discussed the findings of the consultative examiner he requested following the hearing, saying that the examiner diagnosed a learning disorder and dysthymia, found Plaintiff's abilities to understand and carry out instructions were not affected, found only mild limitations in Plaintiff's abilities to interact and respond to change, and assessed a GAF score of 60-65, which was consistent with the treating source opinion from 2007.   Finally, the ALJ noted that the state agency physician determined that Plaintiff's alleged depression did not constitute a severe impairment.   The ALJ concluded that, after a "thorough review" of the evidence, the Plaintiff "has only a mild restriction in activities of daily living, mild difficulties maintaining social functioning, mild difficulties maintaining concentration, persistence and pace, and has not experienced any extended periods of decompensation."

The Social Security Act provides that an impairment is "severe" if it "significantly limits an individual's physical or mental abilities to do basic work activities." Social Security Regulation 96-

9p.  Accordingly, the Supreme Court has adopted what is referred to as a "de minimus" standard: "[o]nly those claimants with slight abnormalities that do not significantly limit any 'basic work activity' can be denied benefits without undertaking" the subsequent steps of the sequential evaluation process.  *Langley v. Barnhart*, 373 F.3d 1116, 1123 (10th Cir. 2004) (citing *Bowen v. Yuckert*, 482 U.S. 137, 158 (1987) (O'Connor, J., concurring)); *see also* 20 C.F.R. §§ 404.1520(c), 404.1521(a). "Basic work activities are 'abilities and aptitudes necessary to do most jobs,' 20 C.F.R. § 404.1521(b), including 'walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling; seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment, responding appropriately to supervision, coworkers, and usual work situations; and dealing with changes in a routine work setting.'" *Id.* (citing Social Security Ruling 85-28, 1985 WL 56856 at *3).

An ALJ is required by regulation to apply a "special technique" at Step 2 when confronted with a claim of mental impairment, such as depression.  *Grotendorst v. Astrue*, 370 F. App'x 879, 882 (10th Cir. 2010) (citing 20 C.F.R. § 404.1520a)).

The first step in that technique is to "evaluate the claimant's pertinent symptoms, signs, and laboratory findings to determine whether [the claimant has] a medically determinable mental impairment(s)." *Id.* § 404.1520a(b)(1). "A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by a claimant's statement of symptoms." *Id.* § 404.1508. ...

Under § 404.1520a(b)(2), once medically determinable mental impairments are found, the ALJ must "rate the degree of functional limitation resulting from the impairment(s)." The ALJ does this by rating the claimant's limitations in "four broad functional areas," which are: "Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." *Id.* § 404.1520a(c)(3). These ratings are then used to determine the severity of the mental

23

impairment(s).

Under the regulations, the ALJ's written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the four broad functional areas.... *Id.* § 404.1520a(e)(2).

*Id.* (internal brackets omitted).

Plaintiff argues that the ALJ erred at Step 2 by relying on a GAF score of 65 for his "non-severe" finding, which Plaintiff contends is in the mid-range and denotes "some difficulty in occupational functioning [which] is clearly more than minimal difficulty."  Plaintiff also notes that her depression was a contributing cause of her periods of noncompliance with treatment for her diabetes.  Further, Plaintiff asserts that the ALJ erred by basing his non-severe finding on the fact that Plaintiff had minimal treatment for depression.

Defendant counters that a specific GAF score may have absolutely nothing to do with a claimant's occupational functioning, but may relate more to social or school functioning.  Moreover, Defendant contends that the ALJ "discussed at length" the evidence demonstrating that Plaintiff's depression was not severe, such as minimal treatment and findings of mild limitations.  Finally, Defendant argues that any non-severe finding is harmless when the ALJ finds a severe impairment and proceeds through the sequential evaluation.

The Court finds first that the ALJ did not err in considering Plaintiff's GAF scores in determining the severity of Plaintiff's impairment.  The ALJ stated, "In February 2007, the claimant was diagnosed with a depressive disorder and assigned a [ ] (GAF) score of 65, suggestive of only

mild symptoms." [AR 27]  According to the Tenth Circuit, a GAF score of 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia), OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  Thus, the ALJ was correct about the "mild symptoms," and the diagnosis itself reflects a mental status exam in which the Plaintiff appeared "anxious" in mood and affect, but "good," "fair" and "appropriate" in the nine other areas. [AR 616]  Consequently, the Court cannot say that the ALJ was incorrect in concluding that the evaluation and GAF score reflected "mild symptoms."

With respect to "minimal treatment," the ALJ found, "[t]he record reveals minimal treatment for the claimant's complaints of depressive symptoms, other than medication prescribed by her primary care physician. This treatment does not suggest the claimant's symptoms are severely debilitating." [AR 27] However, the Tenth Circuit holds,

> the regulations set out exactly how an ALJ is to determine severity, and consideration of the amount of *treatment* received by a claimant does not play a role in that determination. This is because the lack of treatment for an impairment does not necessarily mean that the impairment does not exist or impose functional limitations. Further, attempting to require treatment as a precondition for disability would clearly undermine the use of consultative examinations.

*Grotendorst*, 370 F. App'x at 883 (emphasis in original).  Accordingly, the ALJ erred in considering the lack of treatment for Plaintiff's depression in his severity determination.  "Nevertheless, an error at step two of the sequential evaluation concerning one impairment is usually harmless when the ALJ, as occurred here, finds another impairment is severe and proceeds to the remaining steps of the evaluation. This is because *all* medically determinable impairments, severe or not, must be taken

into account at those later steps." *Id.* (citations omitted; emphasis in original).  In this case, the ALJ found four of Plaintiff's impairments severe and proceeded to the next step of the evaluation; accordingly, the Court cannot find that remand is proper for any errors made by the ALJ at Step 2.

**B.      Whether Plaintiff Had Listed Impairment under § 12.05**

In Step 3 of his evaluation, the ALJ in this case analyzed whether any of the Plaintiff's severe impairments – degenerative disc disease, diabetes mellitus, obesity and carpal tunnel syndrome – met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  [AR 28-30]  He found that none of them did.  The ALJ did not mention any mental impairments in his evaluation. [*Id.*]

The Social Security Administration's Listing of Impairments includes Section 12.00 titled, "Mental Disorders."  In this case, Plaintiff challenges the ALJ's omission of an evaluation as to whether she met the requirements of Section 12.05 for intellectual disability.  Section 12.05 provides:

> 12.05 Intellectual disability: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;
>
> OR
>
> B. A valid verbal, performance, or full scale IQ of 59 or less;

OR

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

OR

D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

    1. Marked restriction of activities of daily living; or

    2. Marked difficulties in maintaining social functioning; or

    3. Marked difficulties in maintaining concentration, persistence, or pace; or

    4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, subpt. P, app. 1. A claimant must meet the "preamble" or "capsule" definition in addition to meeting one of the four severity prongs listed in subsections A-D. *See Montano v. Astrue*, No. 11-cv-02303-WJM, 2012 WL 6701804, at *2 (D. Colo. Dec. 26, 2012); *see also King v. Astrue*, No. 10-cv-01530-LTB, 2011 WL 3471015, at *4 (D. Colo. Aug. 8, 2011) (to meet listing 12.05, the plaintiff "had to show that his impairment met or equaled the capsule definition of mental retardation; that he had a valid IQ score of 70 or below; and that he had another severe impairment.").

Plaintiff contends that evidence in the record demonstrates she meets the listing in Section 12.05C. She argues that the ALJ determined she had physical medical impairments, the intelligence tests conducted by Dr. Vallette after the hearing demonstrate that her IQ is below 70, and her testimony that she was in special education during her school years demonstrates "deficits in

adaptive functioning initially manifested ... before age 22." Plaintiff asserts that such evidence, at least, should have caused the ALJ to make factual findings regarding whether she met Listing 12.05.

Defendant counters that although Plaintiff "may have attended special education classes," such fact is "insufficient to establish the level of impairment necessary to meet Listing 12.05(C)." Defendant also asserts that a later IQ score does not demonstrate a claimant experienced subaverage intellectual functioning prior to age 22. Finally, Defendant contends that any error at Step 3 here is harmless because the record shows Plaintiff cannot meet Listing 12.05C. For example, Plaintiff never mentioned an intellectual impairment to her doctors or in her disability application, certain records reflect that her intellectual functioning is not significantly subaverage, and it is undisputed she worked in semi-skilled jobs in the past.

Plaintiff has the burden of proof at Step 3 and, to establish error, she must show that the record demonstrates she meets the requirements of Listing 12.05C. *See Crane v. Astrue*, 369 F. App'x 915, 921 (10th Cir. 2010); *see also Lax v. Astrue*, 489 F.3d 1080, 1085 (10th Cir. 2007) ("To show than an impairment or combination of impairments meets the requirements of a listing, a claimant must provide specific medical findings that support each of the various requisite criteria for the impairment.") (citing 20 C.F.R. §§ 404.1525, 416.925). While the record demonstrates Plaintiff meets the IQ and impairment requirements of subsection 12.05C, the record does not contain sufficient evidence showing she meets the capsule requirement: "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."

"'Adaptive functioning,' which must be deficient under Listing 12.05, refers to how effectively an individual copes with common life demands and how well [he or she] meet[s] the standards of personal independence of someone with similar characteristics." *Haddock v. Astrue*, No. 09-cv-01922-LTB, 2010 WL 2197403, at *4 (D. Colo. May 28, 2010) (citation omitted).  There are ten areas of adaptive functioning apparently considered by mental health professionals: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety.  [AR 55]; *see, e.g., Lovelace v. Astrue*, No. 09-137-KSF, 2010 WL 5139349, *5 (E.D. Ky. Dec. 10, 2010) (listing "ten areas of adaptive skills commonly used to evaluate overall adaptive functioning in assessing whether an individual is mentally retarded").

The Court notes first that the record contains *no* references to "mental retardation," "intellectual disability," or any intellectual impairments suffered by the Plaintiff until Dr. Vallette's consultative examination conducted after the hearing in February 2009.  Plaintiff asserts that she "raised in her initial application for disability the issue of a mental impairment that significantly limited her functioning," and the document to which she refers is a form titled, "Function Report - Adult - How your illnesses, injuries, or conditions limit your activities." [AR 167-174]  Plaintiff references only the first page of this form, but the Court finds *nothing* on that page reflecting Plaintiff's belief she has a mental impairment.  As for the remainder of the form, Plaintiff reports that she takes care of her son; no one helps her take care of her son; she has "no problem" with personal care; she needs no reminders for personal care or taking medication; she prepares her own meals; she needs no help or encouragement to do laundry and ironing; she drives to church four

29

times a week; she shops for groceries in a motorized scooter; she handles her own finances; she spends time on the phone or at home or church with friends/family; she has no problems getting along with family, friends and authority figures; she follows written and oral instructions "very well"; and she handles stress and changes in routine "very well." [*Id.*]  This form was completed on December 13, 2006 when the Plaintiff was 51 years old. [*Id.*] The Court finds this evidence does not support Plaintiff's contention that she suffers "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested ... before the age of 22."

However, Plaintiff argues that her time spent in special education during her school years demonstrates she meets the capsule definition.  Notably, Plaintiff's testimony is the only evidence in the record of this fact.  "[A]bsent documentary evidence of a deficit prior to the age of twenty-two, the ALJ may find plaintiff's testimony of participation in special education insufficient to support a finding of meeting listing 12.05."  *May v. Colvin*, No. 2:12-cv-00700-EJF, 2013 WL 6732116, at *5 (D. Utah Dec. 19, 2013) (citing *Gist v. Barnhart*, 67 F. App'x 78, 82 (3d Cir. 2003)). Moreover, the Court agrees that the lack of medical findings (or even notations) concerning an intellectual impairment, in addition to Plaintiff's previous work as a school bus driver from 1995-2003 [AR 158], belie the notion that Plaintiff suffers from an intellectual disability as defined in Listing 12.05.

Accordingly, the Court finds no error by the ALJ in failing to evaluate whether Plaintiff had a listed impairment pursuant to Listing 12.05 during Step 3.

## C.    Whether the RFC Reflects Proper Limitations

The ALJ found that Plaintiff had the "residual functional capacity to perform light work as

defined in 20 CFR 416.967(b) except she can lift and carry up to 20 pounds occasionally and 10 pounds frequently; stand and walk about 6 hours during an 8-hour day; and sit about 6 hours during an 8-hour day. The claimant can only occasionally climb, balance, stoop, kneel, crouch and crawl." [AR 30] In making this finding, the ALJ considered whether Plaintiff's medically determinable impairments produced her alleged symptoms and evaluated the intensity, persistence and limiting effects of such symptoms. [*Id.*]

A residual functional capacity ("RFC") assessment is "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work related physical or mental activities." SSR 96-8p, 1996 WL 374184 at * 2. It is assessed "based on all of the relevant evidence in the case record, including information about the individual's symptoms and any 'medical source statements.'" *Id.* "[T]here is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question." *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012).

Plaintiff contends that the ALJ erred in failing to consider the limitations of her carpal tunnel syndrome and obesity in the RFC. Plaintiff also argues that the ALJ completely ignored her medically determinable impairment of depression and assessed no restrictions based on the limitations therefrom.

Defendant counters that the Plaintiff effectively challenges the ALJ's credibility findings, specifically concerning her back pain and carpal tunnel syndrome. Defendant argues that the ALJ's

findings regarding Plaintiff's obesity at Step 3 is sufficient for his RFC evaluation and that Plaintiff

fails to cite to evidence showing that her obesity limited her ability to perform light work.  Finally,

Defendant asserts that the ALJ's decision not to include mental restrictions in the RFC was

reasonable, given the lack of evidence of her mental impairments.

The Court finds first that the ALJ committed no error in assessing the RFC with respect to

Plaintiff's carpal tunnel syndrome.  The ALJ properly considered the medical evidence concerning

the condition, which was minimal, and discussed the lack of any further complaints by the Plaintiff

and of diagnostic testing to support the treating physician's opinion of Plaintiff's abilities to handle,

finger and feel.[3]  While the Plaintiff argues that she did not have the opportunity for *treatment* of her

carpal tunnel syndrome under her medical coverage, there is nothing demonstrating any barrier to

objective testing of the condition.  In addition, the Court finds no error because the Plaintiff fails to

identify which portion(s) of the RFC lack restrictions for her alleged functional limitations in

handling, fingering and feeling.  *See Miller v. Astrue*, 496 Fed.Appx. 853, 859–60 (10th Cir.2012)

(ALJ did not err when he did not include limitations for an impairment he found to be severe at step

two when that limitation was not "borne out by the evidentiary record.").

However, the Court agrees with the Plaintiff that the ALJ erred in failing to consider

Plaintiff's obesity and depression in his RFC assessment.  The ALJ thoroughly analyzes Plaintiff's

impairments of degenerative disc disease, diabetes mellitus and carpal tunnel syndrome, including

medical records and testimony by the Plaintiff concerning her symptoms and limitations.  However,

---

[3]Notably, the physician qualified her opinion by handwriting, next to her signature, in capital letters, "Please note that the majority of my medical attention has been devoted to treating her diabetes rather than her musculoskeletal pain complaints." [AR 891]

while the ALJ determined that Plaintiff's obesity was a severe impairment, he mentions it nowhere

in his evaluation and it is unclear from the RFC itself whether he assessed restrictions based upon

Plaintiff's obesity. *Wells v. Colvin*, 727 F.3d 1061, 1068 (10th Cir. 2013) (" In his RFC assessment,

the ALJ must consider the combined effect of *all* medically determinable impairments, whether

severe or not.") (citing 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2)) (emphasis in original). The only

mention of obesity the ALJ makes in his decision (other than at Step 2) is in Step 3 at which he

makes the following finding:

> Although there is no listing for obesity, Social Security Ruling 02-l p requires that
> this impairment be considered under sections 1.00, 3.00, and 4.00, concerning
> musculoskeletal, respiratory and cardiovascular impairments, respectively, in terms
> of the potential effects obesity has in causing or contributing to impairments in those
> systems.  A thorough evaluation of the medical record, however, does not support
> a finding that the claimant has any listing-level impairments caused by or impacted
> by her obesity.

[AR 29] Even if true, however, the ALJ's finding in this regard is insufficient as the regulations

require that he consider all medically determinable impairments throughout the remainder of the

five-step process.

Moreover, although he found the medically determinable impairment non-severe, the ALJ

was required to, but did not, mention Plaintiff's depression in the RFC evaluation. *Id.* at 1068-69

("[A] conclusion that the claimant's mental impairments are non-severe at step two does not permit

the ALJ simply to disregard those impairments when assessing a claimant's RFC and making

conclusions at steps four and five.").  With a lack of any analysis concerning Plaintiff's depression,

the Court cannot determine whether the ALJ's finding of non-disability is supported by substantial

evidence. *Id.* at 1071 ("[T]o the extent the ALJ relied on his finding of non-severity as a substitute

33

for adequate RFC analysis, the Commissioner's regulations demand a more thorough analysis.").

Because an analysis of these impairments is completely missing from the ALJ's opinion, the Court must remand the matter for a more thorough RFC analysis, including consideration of the Plaintiff's medically determinable impairments of obesity and depression.

<u>**CONCLUSION**</u>

In sum, the Court rejects the Plaintiff's first and second arguments on appeal and finds the ALJ's analyses at Steps 2 and 3 are correct.  The Court also finds that the ALJ properly considered Plaintiff's carpal tunnel syndrome in his RFC evaluation.  However, the Court must conclude that the ALJ failed to apply the correct legal standards in omitting any consideration of the Plaintiff's obesity and depression from his RFC analysis.

Therefore, the decision of the ALJ that Plaintiff Margaret Perez was not disabled is REVERSED AND REMANDED.

Dated at Denver, Colorado this 29th day of October, 2014.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge